**DETROIT CARRIER & MFG. CO. v. DODGE BROS.**

Circuit Court of Appeals, Sixth Circuit.
June 29, 1929.

No. 5121.

George F. Scull, of New York City (Livingston Gifford, of New York City, Fred Gerlach, of Chicago, Ill., and S. Pointer Bradley, of Detroit, Mich., on the brief), for appellant.

Emerson R. Newell, of New York City, (Charles Wright, Jr., and Beaumont, Smith & Harris, all of Detroit, Mich., on the brief), for appellee.

Before HICKS, HICKENLOOPER, and KNAPPEN, Circuit Judges.

KNAPPEN, Circuit Judge. This suit was brought for alleged infringement of United States patent No. 1,179,717, applied for January 12, 1914, issued April 18, 1916, to Harbridge, assignor to plaintiff, relating to carriers for automobiles adapted to be attached to the rear of an automobile, and more particularly to devices for carrying a spare tire, a tail lamp and a number plate. We here reproduce Figure 3 of the patent drawings, being a perspective view of the tire support:

The specification states:

"The improved carrier comprises a supporting ring *a*, and means for adjustably securing said ring at the rear of an automobile. The securing means comprises a plurality of side brackets *b* and *c*. A cross-bar *d* extends diametrically across the ring *a* and is secured to the inner side of the supporting ring *a* at either end by rivets *f* passing through it and the supporting ring. Cross-bar *d* serves as a brace for rigidly securing brackets *b* and *c* and to rigidly cross connect the side portions of the band or ring *a*. Brackets *b*, *c*, incline outwardly and away from the ring *a* and are each riveted to bar *d*, as at *g*. Each of the brackets *b*, *c*, comprises a sleeve *h*, as shown in Fig 3, which has an internally screw-threaded socket, which is adapted to receive a correspondingly threaded terminal *k* of a bracket rod *j* to adjustably connect the rods and brackets. Lock nuts *l*

744

are adapted to rigidly secure the rods and sleeves in adjustable relation."

The flattened terminals of the forwardly, downwardly, and outwardly extending rods $j$ are secured to the frame or body, while the brackets $b$, $c$, and rod $j$ secure the sides of the ring to the body of the vehicle. Screwheaded adjustments between these rods and brackets enable the tilting of the ring in its application to the vehicle, so as to dispose it the desired distance from the back thereof and to adapt it for attachment to vehicles of different sizes or shapes. The lower portion of the ring $a$ is secured to the body by the flattened end $n$ of the bracket $c'$, whose screwthreaded sleeve, locked by the nut $e$, engages the rod $p$, provision being made for adjustment of the ring to the desired relation to the frame. A flange $a2$ on the ring enables the snug seating of the rim there against, and serves to strengthen or stiffen the ring, which is usually of the same diameter as the felloe band of the wheel for which the rim is adapted, the band being somewhat smaller than the inner periphery of the rim—to accommodate wedge lugs between the felloe band and rim. To hold the ring firmly in position at different points around the periphery of the rim proper, bearing surfaces therefor are provided through indentations $a'$ on the ring. The specification permits the alternative use of studs on the rims, adjustment of tire flange and engaging holes in the ring. It is also suggested that in the absence of the studs lugs $d'$ may be formed on the rim, engaging the rearside of the upper portion of the ring, although without such studs the rim and tire would, according to the specification, be held firmly in position by other features. The lower portion of the rim is adapted to be held on the ring by a wedge lug capable of engaging the rear side of the rim, and be there locked into position. The spare rim may be placed on the carrier by loosening the wedge lug and turning it upwardly, whereupon the upper part of the rim may be dropped in place on the upper part of the ring, and the rim then swung forwardly until the wedge lug is forced and secured in position. To remove the rim it is necessary only to loosen the wedge lug, to swing the lower part of the ring rearwardly, then lift the rim to disengage its upper portion from the ring. The means for attaching the lamp bracket and number plate are too simple to require explanation.

After the cause was at issue, on motion by defendant, and with the consent of both parties, the District Court referred the cause to a standing master, to take and report to the court the testimony of all witnesses for both parties, and after the taking of the testimony had been begun it was stipulated that the order of reference be enlarged "so that the master shall also report his findings of fact and conclusions of law on the entire case, including all of the testimony taken." The master made elaborate findings of fact and conclusions of law, holding all the claims in suit not only anticipated by disclosures and structures in the prior art, but also invalid for lack of patentable invention, aside from any question of invalidity, anticipation or prior art. The master recommended dismissal of the bill of complaint. Plaintiff's exceptions to the report (with one exception not requiring mention) were overruled, and final decree entered accordingly.

■■ At the outset we are met with a contention by defendant that the parties having consented that under the reference to the master he report his findings of fact and conclusions of law, the facts found by him are conclusive if supported by any testimony. We cannot assent to this proposition. Passing the consideration that the trial court's approval of the stipulation, made after the taking of testimony had been begun, does not affirmatively appear of record, we think the case does not fall within Kimberly v. Arms, 129 U. S. 512, 9 S. Ct. 355, 32 L. Ed. 764; Davis v. Schwartz, 155 U. S. 631, 636, 637, 15 S. Ct. 237, 39 L. Ed. 289, and kindred cases, where the reference seems to have been construed as being in effect to hear and *decide* all the issues in the case. Here the reference was merely to take the testimony and "report his findings of fact and conclusions of law on the entire case, including all of the testimony taken." The District Judge had thus full power to review the master's findings of fact, as well as of law. Edward G. Budd Mfg. Co. v. C. R. Wilson Body Co. (C. C. A. 6) 21 F.(2d) 803, 805 (certiorari denied by the Supreme Court 276 U. S. 632, 48 S. Ct. 325, 72 L. Ed. 742). Such findings of fact, however, concurred in by the district judge, will not be disturbed on review by anything less than a demonstration of plain mistake. Dickinson v. O. & W. Thum Co. (C. C. A. 6) 8 F.(2d) 570, and cases cited at page 572.[1] ■ But conclusions of law, although concurred in by master and judge, are always

[1] The general proposition invoked, that written findings of fact if sustained by any substantial evidence must be accepted as final and conclusive, relates to trials at law where a jury has been waived. Corey v. Atlas Coal & Coke Co. (C. C. A. 6) 277 F. 138, 142; Cino, etc., Co. v. B. G. Sandwich Shops (C. C. A. 6) 24 F.(2d) 31.

open to review. Dickinson v. Thum Co., supra, 8 F.(2d) at page 572. And while questions of invention or patentable novelty or infringement are, in a proper sense, issues of fact, they so far present questions of law as to be properly reviewable here. Budd Mfg. Co. v. Wilson Body Co., supra, of 21 F.(2d) at page 805. It should, however, go without saying that such concurrent findings of law by master and judge should not be lightly disregarded.[2]

The broadest of the claims in suit are Nos. 17 and 19, which, as allowed by the Patent Office, we print in the margin.[3] We agree with the courts below that these claims are invalid, both for anticipation and for lack of invention. The earliest claimed date of Harbridge's conception is the last week of January, 1913, at the Chicago Automobile Show. It is established that the Perrin carrier, on a Lozier car, was in public use as standard equipment as early as January, 1912. The Lozier-Perrin carrier seems to have differed in no substantial respect from the Harbridge carrier as regards the claims we are now considering, except that the Lozier-Perrin carrier had a circle of angle iron, the horizontal portion of which constituted a ring, making a *vertical* flange at one edge of the ring, which flange, plaintiff claims, does not form an internal seat for a demountable rim. In interference proceedings between Perrin and Harbridge, while the instant case was pending in the District Court, it was held by all the tribunals of the Patent Office that the rim carriers of both parties had substantially the same construction, that the claims (here numbered 17 and 19) read on both, and that Perrin's claims were entitled to priority. For the opinion of the Court of Appeals of the District of Columbia (affirming the decision of the Commissioner of Patents), see Harbridge v. Perrin, 54 App. D. C. 106, 295 F. 927. Certiorari was denied by the Supreme Court, 264 U. S. 597, 44 S. Ct. 454, 68 L. Ed. 868. Harbridge thereupon disclaimed the combination of claims 17 and 19, except where (claim 17) the peripheral flange has a portion which fits into and forms an internal seat for a demountable rim, and (claim 19) where the outwardly extending flange has a peripheral portion which forms an internal seat for a demountable rim. Claims 17 and 19 must therefore be considered here, as below, in the form limited by the disclaimer. Michigan Carton Co. v. Sutherland Paper Co. et al. (C. C. A. 6) 29 F.(2d) 179. The decision in Harbridge v. Perrin must be accepted by us.

Besides the Perrin-Lozier carrier, it is established that the Stevens-Duryea carrier was in public use as standard equipment previous to and at the time of Harbridge's conception —as used on certain cars of the runabout type, and as sufficiently described by the master as having "a wooden ring like the felloe of a wheel, it carried four bolts with threaded ends, projecting from the upper side of the ring. Attached to the other side of the ring were four feet having inclined faces, against one side of which the ring rested, and which constituted in function a sectional flange on the side of the ring opposite the bolt ends. Each projecting bolt carried a 'Continental' wedge which entered between the rim and ring and was forced into place by a nut, thus wedging the rim both laterally and radially and holding it securely in place on the carrier. The ring also had a hole for the valve stem to enter. A round metal box with a hinged cover to carry tools, tubes, etc., was secured inside the wooden ring."[4]

Furthermore, at the time of and before Harbridge's conception, automobile wheels with metal felloe bands, employing bolts and wedges substantially of the same shape as Harbridge's, and with the same functions for-

---

[2] While the testimony of defendant's witnesses relative to the existence of the prior art, relied upon by the master as defeating the patent claims in suit, was largely, if not entirely, taken by depositions out of court, the entire of plaintiff's evidence, including its rebuttal testimony of 14 witnesses, discussing the testimony of such prior art, was taken in open court.

[3] "17. In a carrier for vehicles, the combination of a supporting ring adapted to fit into a demountable rim, a peripheral flange formed integral with and extending from said ring at one edge, attaching means for securing the ring to a vehicle, and means for securing the rim on said ring in contact with said flange."

"19. A tire carrier comprising an annular tire supporting member in the form of a metal rim adapted substantially to fit the inner periphery of the tire, having a free open space therethrough within the periphery thereof and having an outwardly extending flange projecting from one of its edges, a tire engaging member confined to the edge of said rim on the side of the rim opposite the edge provided with the flange and fastening means engaging said tire engaging member to lock the same in position, said fastening means being accessible from said opposite side of the tire supporting member." The master points out that in claim 19 "the words 'tire' and 'rim' have been loosely used in the claim, and should have been 'rim' and 'ring' respectively."

[4] The Cronk or Kelsey carrier is not referred to by the master, and we have no occasion to consider it. The Howard carrier seems not to have been relied on by the master as respects claims 17 and 19, nor have we found it necessary to cite it as to those claims.

removably holding demountable rims, and whereby the rim was held clamped between an inclined flange on the one side and a plurality of adjustable wedges on the other side, entering between the rim and the ring, were old. We need refer only to the German patent No. 934,187, September 4, 1909, to Kinderscheerf, and the British Patent No. 10,620, October 15, 1908. One of plaintiff's expert witnesses testified that, to the extent that the adjustable wedges and adjustable flanges on the opposite side take care of the variation in size, and enable rims varying in size to be held securely, the operation of the felloe band, its flange, and the wedges is precisely the same, whether used on a wheel or used on a carrier having a spare tire. This being so, there seems merit in the proposition that the use of the old felloe band structure to carry a spare rim in the same manner, and by the same means, that the old wheel structure carried its rim, is, as applied to the claims now under consideration, merely a double use, notwithstanding the device as used in the wheel has functions not present in the tire carrier, and that in the tire carrier the device serves some functions not present in the wheel. We content ourselves with referring to certain decisions of this court and citations therein. Stearns & Co. v. Russell, 85 F. 218, 226 et seq. (opinion by Judge—now Mr. Chief Justice—Taft); Weir Frog Co. v. Porter (C. C. A.) 206 F. 670, 674.

But whether or not Harbridge's use, in carrying a tire, of the means in general use on a device for carrying a wheel is technically a double use, it would seem the natural course for one designing a tire carrier to adopt the means publicly used and well-known in the case of a wheel carrier; and we see much force in the master's suggestion that Brown's article on "Tires and Tire Equipment at the Garden Show," published in the "Horseless Age" of January 10, 1912, "gave the art the additional and correct information that an ordinary felloe band could be used instead of the sectional flange actually embodied in the Stevens-Duryea carrier." We think the master was justified in the conviction that "the rim-carrying device of the patent in suit is, in substantial and essential respects, merely an adaptation of an old and well-known wheel structure to the purposes of carrying a spare wheel on a vehicle, and that such adaptation did not involve patentable invention." We think the master correctly interpreted the element in claim 19, "having a free open space therethrough," as meaning that the ring "within the periphery" is not entirely blocked up.

Claims 17 and 19, before the disclaimer, were completely anticipated by Perrin; as modified by the disclaimer, we think the claims equally invalid; for we are constrained to the conclusion that, in view of the Stevens-Duryea carrier, the "Horseless Age" article, and the inclined-flanged felloe band arrangements of the prior demountable-rim wheel art, there was no invention in substituting for Perrin's verticle flange an inclined-flange portion fitting into and forming an internal seat for the demountable rim. We reach the conclusion that claims 17 and 19 are invalid, without considering the Tuttle patent.

Claims 8 and 9 relate particularly to the centering features referred to in the descriptive portion of this opinion, and means for removably securing the rim to the ring and the latter to the vehicle. These claims are printed in the margin.[5] We think there was no novelty therein, in view of United States patent to Michelin, No. 927,266, issued July 6, 1909; United States patent to Baker, No. 1,095,953, applied for February 11, 1911; and United States patent to Baker, No. 1,-227,990, applied for December 31, 1912.

Claims 13 and 16, which we print in the margin,[6] relate to the cross-bar feature, claim 16 covering also provision for lamp and number plate. This feature was not new, in view of the Howard car, which had a cross-bar, carrying a lamp and license plate. We think the Howard reference none the less effective from the fact that its cross-bar was not attached to a complete ring. Its function was the same as in the case of a complete ring,

[5] "8. In a carrier for vehicles, the combination of a supporting ring adapted to fit into a demountable rim and having raised bearings thereon for engaging the inner periphery of the demountable rim, attaching means for securing said ring to a vehicle, and means for removably securing the rim to said ring."

"9. In a carrier for vehicles, the combination of a supporting ring, and attaching means for securing the rim to a vehicle, said ring being adapted to fit into a demountable rim and having bearings thereon for engaging the inner periphery of the rim, said bearings being formed by indenting the ring outwardly, and means for removably securing the rim to said ring."

[6] "13. In a carrier for vehicles, the combination of a ring, attaching means for securing the ring to a vehicle, said ring being adapted to fit into a demountable rim, a cross-bar secured to the ring, and a lamp bracket secured to the cross-bar."

"16. In a carrier for vehicles, the combination of a ring, attaching means for securing the ring to a vehicle, said ring being adapted to fit into a demountable rim, and a cross-bar secured to the ring and provided with means whereby a lamp and a number plate may be secured thereto."

namely, to strengthen or stiffen the ring or arc. Its adaptability to Harbridge's ring was, we think, obvious to the mechanic skilled in the art.

Of the objection that the master did not personally see and hear the witnesses who testified to the prior use of the Howard carrier, it seems enough to say that their testimony seems to us clearly to preponderate in favor of such priority over Harbridge. Indeed, the testimony seems undisputed that the Howard carrier was completed before the Chicago Automobile Show (at which show Harbridge conceived his invention), and was actually on exhibition at that show; and we are disposed to agree with the master that "it would be a mere mechanical expedient to add such a cross-bar to the ring of the Lozier-Perrin or Stevens-Duryea carrier, for example, to carry a lamp and license plate in the same manner as did the Howard carrier, consequently producing whatever stiffening effect is obtained by such a bar so located and attached."

In reaching the conclusion that the various claims in suit are invalid, we do not overlook the well-settled principle that invention may exist in a combination even if every element thereof is old, provided a materially new or better result is obtained, or an old result obtained in a materially better way. Webster Loom Co. v. Higgins, 105 U. S. 580, 591, 26 L. Ed. 1177; Expanded Metal Co. v. Bradford, 214 U. S. 366, 381, 29 S. Ct. 652, 53 L. Ed. 1034; Michigan Carton Co. v. Sutherland Paper Co. (C. C. A. 6) 29 F. (2d) 179, 182, 183. But the question of invention is ultimately one of fact, to be determined from a weighing of all pertinent considerations, and not only are the concurrent conclusions of master and judge presumably correct, but, on consideration of this record, they impress us as convincing.

Nor do we fail to appreciate that when invention is otherwise in doubt favorable public reception may throw the scale in favor of invention. It is, however, a commonplace that, except in case of doubt, such favorable public reception cuts no figure. Duer v. Corbin Cabinet Lock Co., 149 U. S. 216, 223, 224, 13 S. Ct. 850, 37 L. Ed. 707; McClain v. Ortmayer, 141 U. S. 419, 429, 12 S. Ct. 76, 35 L.

Ed. 800; Package Machinery Co. v. Johnson, etc., Co. (C. C. A. 6) 246 F. 598, 602. The Harbridge carrier seems for a time to have been largely used. As bearing on the reason for such large sales, the master found certain facts, which we print in the margin.[7]

The master found, as conclusion of law, that "the commercial success of plaintiff's carrier, under the circumstances mentioned, does not prove or tend to prove validity of the claims in suit or any of them; especially where they are clearly invalid as in the case here, in my opinion."

We are constrained to accept the master's conclusions, concurred in, as they are, by the district judge. This conclusion makes it unnecessary to consider the subject of infringement.

The decree of the District Court is affirmed.

---

[7] "The carriers of the plaintiff and its predecessors have been widely used, about 3,000,000 having been sold. Some other car manufacturers do not use plaintiff's carrier. Plaintiff's witnesses variously estimate the percentage of its carriers used as from 50 per cent. upwards. Some of plaintiff's carriers had raised bearings, and some omitted them. The same is true of the cross-bar. Until Harbridge left the company in 1916, he spent all or substantially all his time canvassing the trade by personal calls. Very little advertising was done. Harbridge sometimes made as many as 25 calls on the same person before making the sale or not. The same sales policy was continued by Mercer after Harbridge left. The carrier was sold to the trade at around $1, to one concern at least at a loss, which was charged to advertising. Some concerns bought the carrier because its cheapness appealed to them. Plaintiff had no competition. It was the only one in the business who made a specialty of spare rim carriers. Car manufacturers who did not use plaintiff's carrier manufactured their own carriers. The record shows that plaintiff for several years tried to induce defendant to buy its carrier, and undercut the above price materially in its unsuccessful attempt. During this time defendant contended that there was nothing patentable in the Harbridge carrier, and the matter was considered by both parties as 'a mere merchandising proposition.' Defendant was willing to buy plaintiff's carriers if they could be supplied cheaper than defendant could make them, and not otherwise. The record proves extraordinary energy and push in salesmanship, cheapness of product, no competition, and that these things, or some of them, were material factors in the sales which were made."