## UNITED SHOE MACHINERY CORPORATION v. DAY WOOD HEEL CO.

## DAY WOOD HEEL CO. v. UNITED SHOE MACHINERY CORPORATION.

### Nos. 5319, 5320.

Circuit Court of Appeals, Sixth Circuit.

Feb. 13, 1931.

· Hector M. Holmes, of Boston, Mass. (Fish, Richardson & Neave, of Boston, Mass., on the brief), for United Shoe Machinery Co.

James M. Hengst, of Columbus, Ohio (Shepherd & McDowell, of Columbus, Ohio, on the brief), for Day Wood Heel Co.

Before DENISON, MOORMAN, and HICKS, Circuit Judges.

HICKS, Circuit Judge.

Suit by United Shoe Machinery Corporation against the Day Wood Heel Company for infringement of patent to Russ, No. 1,536,691, dated May 5, 1925, for a "Heel Blank Breast-Shaping Machine" and of patent to Russ, No. 1,528,345, dated March 3, 1925, for "Heel and Method of Making the Same." The defenses were noninvention, anticipation, and prior use and knowledge. Claims 1, 3, 5, and 6 of patent No. 1,536,691, herein called the machine patent, and all claims of patent No. 1,528,345, herein called the product and method patent, were in suit. The court sustained the machine patent as valid and infringed, and defendant appealed. The court held the product and method patent invalid because of both prior use and noninvention, and plaintiff appealed.

Product and Method Patent No. 1,528,-345: Claim 1 for the product is typical.[1] Claim 3 for the method differs in no substantial respect from claim 1. Both claims are for the same invention, if there is invention, whether for the product or process, and need not be separately considered.

Long before 1910, the wood shoe heel was in commercial use. During the period from 1910 to 1912, there was a demand for a type of wood heel for women's shoes called the "Cuban." In the terminology of the manufacturers, that part of the heel secured to the shoe is the "seat," and that part contacting with the ground is the "top." As the heel is attached to the shoe, the front portion is called the "breast" as distinguished from the rounded side and back portion called the "contour." The earlier Cuban heels were made with a straight breast, but the fashion demanded a change to the transversely concave breast. This was easily provided by forcing the heel back straight across the cutting edge of a barrel saw, but in this operation the intersection of the concave breast with the surface of the rounded contour presented slightly curved edges when viewed from the side. The trade asked that these edges be made straight, and Ross made them straight upon his machine which cut the transverse concave breast and by the same operation made the breast convex longitudinally. His conception was that a breast so designed and properly proportioned would terminate at its intersection with the contour in straight edges when viewed from either side. This signified more than mere mechanical skill. It was not an obvious thing. Its conception was difficult, and the actual achievement is not now easy of explanation, but the heels thus made were a commercial success, and we think they amounted to patentable invention both in process and in product.

We do not think defendant has shown prior use or knowledge of such heels or the method of producing them beyond a reasonable doubt. Witham, whose testimony is uncorroborated, made wood heels with a concave

---

[1] "1. A heel blank having longitudinally concave side surfaces and a longitudinally convex, transversely concave breast surface, the relative concavity of the side surfaces and convexity of the breast surface so neutralizing each other that their lines of intersection at each side of the blank lie in approximately the same plane."

breast and straight breast edges in 1916 or 1917. He claims to have straightened the breast edges by applying a buffing roll, but it is quite certain that he knew nothing of heels having straight breast edges produced by the Russ machine or method. Tisdale, likewise uncorroborated, testified that he made wood heels with a curved breast and straight breast edges about 1901 or 1902; that he made the straight edge by applying a buffing roll, but he frankly admits that the concave breasts did not have longitudinal convexity.

■ Sanders, a manufacturer, having the common interest of the industry in the result of the suit, testified that on November 7, 1927, which was while the suit was in progress, he made two heels which he exhibited. These transversely concave heels are also slightly convex longitudinally and have straight breast edges. Although they were made by Sanders to be exhibited with his testimony, no one connected with the plaintiff was present at the experiment. No one was present at all except Dickinson, whose testimony was not taken. Sanders testified that he made these heels by the use of a bevel guide attached to a barrel saw machine, which caused the heel block to pass the saw in the arc of a circle; that by the use of this same attachment he somewhere between 1909–1913 made similar heels for a customer whose name he does not remember. He does not claim to have intentionally produced the straight breast edge by means of the neutralizing effect of a heel breast transversely concave and longitudinally convex. His straight breast edge was a pure accident, and novelty is not negatived thereby. Tilghman v. Proctor, 102 U. S. 711, 26 L. Ed. 279; Pittsburgh Reduction Co. v. Cowles Elec. S. & A. Co. (C. C.) 55 F. 301, 307; see also Diamond Patent Co. v. S. E. Carr Co., 217 F. 400, 402 (C. C. A. 9).

Day, Treasurer of the defendant company, testified that for about three years beginning in 1910, and while doing business at Haverhill, Mass., as the Fred A. Day Corporation, he made several thousand dozen Cuban heels similar to heels covered by plaintiff's patent and by processes similar to the method of plaintiff's patent by the use of a tapering metal guide attached to the saw table of a barrel saw and which forced the heel block by the saw in a circular path. Neither this guide nor any of these heels are in evidence. According to Day, he made these heels without any particular urge or reason. It is fair to say that Day is corroborated by the testimony of his then employees, Felch,

Post, and Owen, to the extent that some such heels were made about 1910 by the Day Corporation, but he is uncorroborated as to the quantity of the output. Felch thought that the quantity was possibly more than a hundred dozen, and Owen testified that they were "not much of a go." Day and Felch left the Day Corporation in 1912, and were employed for about three years by the Maple Wood Heel Company at Newburyport, Mass. Felch testifies that Day also made the anticipating heels at the Maple Company, but Day has no recollection of it. Day testified that the principal customer of the Day Corporation was the Fred W. Mears Company; that "he must have sold them these straight breast line Cubans in very large quantities, thousands of dozens, perhaps"; but Wentworth, who was foreman of the Mears Company in 1911 and 1912, testified that during that period he never saw nor heard of such Cuban heels; that he was employed by the Maple Heel Company from September, 1913, until February, 1914, and that during that time none of the anticipating heels were made, and that he would have known it if they had been made. Lovejoy also testified to the same effect.

■ Anticipation cannot be proven alone by the number of witnesses introduced to support it. Barbed Wire Case, 143 U. S. 275, 12 S. Ct. 443, 36 L. Ed. 154; American Bell Tel. Co. v. People's Tel. Co. (C. C.) 22 F. 309. It must be determined by a consideration of the evidence in the aggregate, and, so treating it, the case is not free from reasonable doubt. Giving due weight to the testimony of these witnesses taken 12 to 15 years after their purported knowledge of the anticipating heels, it is entirely too uncertain whether the heels and method for making them were sufficiently similar to plaintiff's patent to constitute anticipation. Deering v. Winona Harvester Works, 155 U. S. 286, 301, 15 S. Ct. 118, 39 L. Ed. 153.

Day left the Maple Heel Co. about 1915 and established the defendant, the Day Wood Heel Company, at Cincinnati, and later established plants at Columbus and St. Louis, at which points the company has since operated. It has never since used the tapering bevel metal guides. That it did not use them from 1915 to 1924 is not remarkable, because during that period there was but slight, if any, demand for heels having curved breasts and straight breast corners, but it is significant that in 1924 the Day Company with the return of the fashion, straightened the breast edges by means of the old buffing roll

as used by Tisdale and Witham rather than by the tapering bevel metal guide. Plaintiff's application for his process and product patent was originally filed May 15, 1924. The patent was granted March 3, 1925. On June 30, 1926, defendant inserted in "American Shoemaking" the following advertisement: "Improved Wood Heels Made by New Machine—Straight Edge Line Breast—With the aid of a new machine we have recently perfected, we now offer neat-appearing Cuban Heels. Our latest models have added snap and style, due to the new method of curving. Let us show you samples today." We think it quite improbable that defendant would have published this announcement touching "improved wood heels" made by a new machine "straight edge line breast. * * * Our latest models have added snap and style due to new method of curving," if it had really known of such heels in 1910 and of the method for making them.

Machine Patent No. 1,536,691: We think it likewise disclosed invention. Claim 6 is printed.[2] The elements are old, but in combination a machine was evolved which mechanically, quickly, economically, and by one operation produced the straight edge curved breast Cuban-heels designed by Russ, and for which there was a trade demand. It conception and construction involved something more than the obvious. It largely eliminated the human element present in all prior machines used for any similar purpose.

We do not think this machine patent was anticipated by patent to Conner, No. 1,415,921 (1922). Conner's idea was to cut the breast edges of the heel with a flexible or flexing knife. His device could not be successfully operated upon a wood heel, and does not in any way disclose Russ's conception.

Nor was it anticipated by patent to Marshall, No. 1,510,009 (1923). The Marshall patent was designed to cut a groove or recess in the heel at the lower extremity of the heel breast. Modification was necessary before it

would perform the function of the patent in suit. Topliff v. Topliff, 145 U. S. 156, 161, 12 S. Ct. 825, 36 L. Ed. 658; Babcock & Wilcox Co. v. Springfield Boiler Co., 16 F.(2d) 964, 969 (C. C. A. 2). The same observation applies to Sanders, patent No. 1,213,271, issued in 1917. The undisputed evidence is that it would be impossible for the Sanders device to produce a heel breast concave transversely and convex longitudinally. The remaining patents relied upon as anticipations, to wit, Stevens, No. 190,542 (1877), Osten, No. 128,243 (1872), and Luttrell, No. 951,784 (1910), are for stave sawing machines, an entirely different art, and have little or no relevancy. Nor was there anticipation by the machine made by Draper in 1920 or 1921. Admittedly the heel breast made upon the Draper machine was concave longitudinally, not transversely, and its edges were curved.

Infringement: Proof of infringement is clear. In patent No. 1,528,345, the claims read upon defendant's product and method, and in patent No. 1,536,691, the claims in issue read upon defendant's machine.

The decree of the District Court is reversed as to patent No. 1,528,345 and affirmed as to patent No. 1,536,691.

[2] "6. A heel-blank, breast-shaping machine comprising a rotary cutter having its cutting edges movable in a circular path and adapted to form a transversely concave breast surface on the blank when the blank is moved longitudinally in engagement therewith, a support, a carrier mounted thereon to swing in a curved path, a blank-holder mounted on said carrier in position to carry the blank longitudinally in engagement with the cutter, as the carrier is swung on said support and to present the blank to the cutter at constantly varying angles as it is moved past the same and means to vary the inclination of said holder on the carrier to vary the initial angle of presentation of the blank to the cutter, said means including a pivotal connection between the holder and carrier adjacent the outer periphery of the path of the holder.