### CUGLEY et al. v. BUNDY INCUBATOR CO.

#### No. 7646.

Circuit Court of Appeals, Sixth Circuit.

Dec. 13, 1937.

Otis A. Earl and Ralph L. Chappell, both of Kalamazoo, Mich. (Thomas G. Haight, of Jersey City, N. J., and Earl & Chappell, of Kalamazoo, Mich., on the brief), for appellants.

Albert L. Ely, of Cleveland, Ohio (Laurence W. Smith and Smith, Strawhecker & Wetmore, all of Grand Rapids, Mich., on the brief), for appellee.

Before SIMONS and ALLEN, Circuit Judges, and HAMILTON, District Judge.

ALLEN, Circuit Judge.

Appeal from a decree holding Patent No. 1,911,250 valid and infringed, and enjoining appellant company, which is a manufacturer of incubators competing with appellee, and appellant George Cugley, manager and vice-president of appellant company, from manufacturing or using structures which infringe. The patent is for a method, and the only claim involved is No. 5, which reads as follows:

"In a method of operating a mammoth incubator, placing eggs in an inclosure, heating the air to a constant temperature, stirring the air in the enclosure, humidifying the air to a relatively low humidity, moving the eggs to another enclosure, again heating the air in which the eggs are located, again stirring the air, again humidifying the air to a relatively higher humidity without increasing the temperature and while maintaining it at the same constant."

The art of incubating is old, and is fully described in many adjudications.[1] Eggs were formerly incubated in one-

---

[1] See Smith v. Snow, 294 U.S. 1, 55 S. Ct. 279, 79 L.Ed. 721; Waxham v. Smith, 294 U.S. 20, 55 S.Ct. 277, 79 L. Ed. 733; Wolf v. Buckeye Incubator Co., 6 Cir., 296 F. 680; Buckeye Incubator Co. v. Petersime, 6 Cir., 19 F.2d 721; Buckeye Incubator Co. v. Blum, 6 Cir., 27 F.2d 333; Buckeye Incubator Co. v. Boling, 6 Cir., 46 F.2d 965.

chambered cabinets, in which the incubation and the hatching took place, there being no mechanical agitation of the air. The necessary moisture was obtained by placing pans of water within the incubator or by sprinkling the eggs. Later, in order to control the temperature, fans were placed in the incubator by which the air was circulated. Incubation requires eighteen days, and hatching requires three additional days, during which the eggs give off heat, thus raising the temperature. Smith, in his "staged" incubation method, placed the eggs in the cabinet at intervals of three or four days, using the heat generated by the hatching eggs for the purpose of helping to incubate the eggs in the earlier stages. Smith v. Snow, 294 U. S. 1, 55 S.Ct. 279, 79 L.Ed. 721. Smith also circulated the air in the cabinet by means of fans. In all of the earlier forms of incubators, as well as in Smith, while the temperature and moisture might vary at different times, all of the eggs at any given time were subjected to the same degree of temperature and to the same humidity because they were not segregated.

A later step in the process of incubation was the invention of the separate hatcher incubator in which the incubating eggs and the hatching eggs were placed in separate compartments of the incubator. The Stover process adopts the two separate compartments and changes the conception of the treatment of temperature and humidity theretofore existing. The temperature in both chambers is the same, but the humidity is substantially raised in the hatching chamber. The air is agitated in each enclosure. In the specifications of the patent the exact steps for carrying on the process are detailed, and the differentials in humidity are set forth.[2]

It is the theory of the method in suit that during the hatching period an increased humidity is needed. The chick, which is attached to the shell by a thin membrane, must turn itself inside the shell in order to "pip," or break through the shell. If the membrane dries, the chick cannot do this, and must be manually removed from the shell. The chick comes out of the shell wet, and if the air is dry, evaporation is too rapid, and the chick is chilled. A higher humidity corrects this condition, and also promotes the calcium metabolism of the chick, allowing it to absorb part of the calcium from the shell. This is advantageous in two ways: it makes the chick sturdier and weakens the shell, making it easier for the chick to break out. If the air is dry, the down flies through the compartment, tending to spread a baccillus infection. For these reasons it is essential that the humidity during the hatching process be increased over that maintained during the incubation process. The degree of humidity necessary for the hatching process is detrimental to the incubating process, resulting in a high mortality of embryos.

Since eggs in the hatching period give off much heat, a humidifier cooler is provided by Stover to keep the temperature constant and to increase humidity by passing a portion of the air through a spray of water created by a revolving wheel. The use of the Stover method produces new and beneficial results. Incubators using this method have increased their hatches from six to fifteen per cent.

In the catalogues of appellant company

[2] "The humidity control and the amount of humidity in the incubating compartment are the essentials of my invention. I arrange the humidity from 78 to 80 degrees while maintaining the temperature at 99½ degrees. When the eggs are at the end of the 18th day of incubation, I move them over into the hatching compartment where I increase the humidity from 84 to 86 degrees while maintaining the temperature at 99½ degrees. Thus by keeping the humidity down during incubation, I prevent the chicks from becoming sticky and adhering to the shell, but upon being put into the hatching compartment, I can safely increase the moisture which softens the shell and enables an easy hatch. The chick is then so far advanced at the 18th day that the increase in moisture does not have a disadvantageous result heretofore indicated of excess moisture during incubation period. This cannot be avoided where the eggs being incubated and eggs being hatched are in the same compartment. By using the combined compartments of incubation with uniform heat and relatively low humidity and hatching with uniform heat and relatively high humidity, I secure the new result of a very soft shell easily broken by the chick while at the same time the chick has adequate moisture during its incubation period, but not enough moisture to cause adherence to the shell. Of course, I get the further result of prevention of the transmission of disease and of greatly increased cleanliness, as the refuse from hatching is kept out of the incubation chamber."

and its predecessor, issued prior to the notice of infringement, the importance of constant temperature and increased humidity at hatching time was constantly stressed. In speaking of the advantages of the separate compartments, appellant company's predecessor advertised: "The temperature and moisture can be correctly regulated for the two stages of incubation which unquestionably produces more chicks and better chicks because it is a well known fact that to obtain the best hatching results a higher humidity and less heat is required at hatching time than during the earlier stages of incubation." Statements such as these made in appellant company's publications carry more force than its present denial that any advantage results from the Stover method.

While the component elements of the method are old, it achieves such new and highly meritorious results that we conclude that it rises to the dignity of invention. Goodyear Tire & Rubber Co. v. India Tire & Rubber Co., 6 Cir., 51 F.2d 204; Detroit Carrier & Mfg. Co. v. Dodge Bros., 6 Cir., 33 F.2d 743. Cf. Bassick Mfg. Co. v. R. M. Hollingshead Co., 298 U.S. 415, 419, 56 S.Ct. 787, 788, 80 L.Ed. 1251.

Appellants contend that every feature of this method existed in the prior art. It is true that incubators with separate hatching and incubating compartments are not new. The agitation of the air and the process of securing increased humidity at hatching time, either by the use of pans of water placed in the incubating chamber, or through the manipulation of ventilators, are also old. Appellee contends, however, that these old features have never been united with the feature of constant temperature in both chambers, and that the combination of all of these elements produces a new and improved result.

The early practice does not anticipate Stover, for as hatching proceeds, it increases the temperature, while Stover requires that the temperature be kept constant in both chambers. Thus the Hannas, the Cline, and the Lamon & Slocum publications all recommend an increase in temperature during the hatching period. The still air incubators followed this early teaching and increased the temperature in hatching. The single-chambered incubators subjected the eggs in both stages to the same conditions of humidity and temperature, and do not anticipate. For instance, while the Bundy Patent, No. 1,850,918,

states that increased moisture in hatching is one of its objects, such an increase could not be obtained without subjecting all of the eggs to uniform humidity.

The McCoy Patent, No. 1,740,741, is claimed to anticipate Stover. It discloses a cabinet divided into two compartments, one for incubation and one for hatching. It does not provide for the increased humidity which, with the constant temperature, is the gist of Stover's idea, nor does it state that increased humidity is an object of the invention. Appellants claim, however, that the McCoy practice attained the same effects as Stover, citing the McCoy circular published in 1927. McCoy, in addition to having two separate chambers, had ventilators, and humidity was supplied to the compartments by water pans. Paragraph 9 of the circular reads as follows:

"'Hatching Chamber' separated from the 'Incubating Chamber' by a solid partition. This feature enables the operator to control the two stages of incubation individually, each precisely according to its requirements. The 'Hatching Chamber' can be cleaned and disinfected without disturbing the 'Incubating Chamber.'"

We agree with the District Court that this circular was indefinite and did not set forth the Stover process. While the circular recognizes the existence of separate temperature and humidity requirements for each of the two chambers, it nowhere states what these requirements are. The prior art does not fill in the gaps in the McCoy teaching so that one skilled in the art could practice the Stover process from the description in the McCoy circular. We conclude that neither the McCoy patent nor the McCoy circular anticipates the Stover method.

The claimed use of the McCoy incubator in accordance with the Stover process adds no weight to appellants' contentions, for the record indicates that it was used only in Canada. Cf. Hurlbut v. Schillinger, 130 U.S. 456, 471, 9 S.Ct. 584, 32 L.Ed. 1011; Permutit Co. v. Wadham, 6 Cir., 13 F.2d 454, 456.

Appellants also claim a prior use by Robbins. Patent No. 1,728,980 was issued to Robbins upon an application dated February 26, 1928 (re-issued October 31, 1933). Robbins admits that in this application he copied the separate hatcher compartments of McCoy. His cabinet discloses fans for air circulation, heater, and water pans for supplying humidity. Robbins stated that he

operated this incubator to secure the same differential of humidity in the hatcher as Stover, and that he used a humidifier cooler prior to Stover.

But Robbins' testimony is not entirely credible. Not only is it supported by no contemporaneous or physical evidence, but he himself testified in effect in an infringement suit covering the same subject-matter which was tried in Denver, Colorado, in December, 1929, that he concluded that it was not so much the moisture as that his information on the subject of moisture was rather limited. Anderson, Robbins' patent attorney, says that Robbins did not divulge to him any ideas that he may have had about the control of moisture. His patent does not mention this among the objects of his invention.

It is true that Robbins' instruction book, published in 1928, recommends a certain increase in humidity, but he teaches nothing as to temperature.

As to his prior use of a humidifier cooler, which Robbins claims that he invented in 1928, this is completely discredited by numerous statements in his various catalogues and advertisements, which show that he claimed the invention of this moisture producing means in 1930, and stated that it was "new." The testimony of Schipper, who used one of Robbins' incubators in 1928, does not strengthen appellants' case, for Schipper clearly shows that even if Robbins operated with differentials in humidity, the temperature was not constant in both chambers, but was somewhat higher in the hatching compartment. As there were no eggs in the incubator at the time of the experiment concerning which Schipper testified, and since hatching eggs give off heat, an even greater disparity in temperature existed in operation than that stated. The Stover process was not practiced by Robbins prior to the allowance of Stover's patent.

The Lower Patent, No. 1,911,233, is relied on by appellants. It is not necessary to decide whether Lower was prior to Stover, for in our view Lower does not anticipate. His device embodied two compartments. However, its method of operation is so distinct from that of Stover that it is not germane to the controversy. The temperature was increased in the hatching chamber. The practice of Lower also fails to indicate the necessity of temperature constant in both chambers. Since the patent provides not for a free circulation of air, but for a choking of the flow of air through screenwire partitions, the temperature would rise considerably in the hatching chamber. It could in fact not be reduced unless the humidity was also reduced by conducting outside air into the hatching chamber.

While the New Town incubators secured an accidental increase of humidity at the hatching of the chicks, caused by their giving off moisture at that time, this was too late to affect the process. It was not, as in Stover, obtained at the start of the hatching period. The so-called "Xenia" incubator, in its essential features, was the invention of Stover, and not of Bundy. We conclude that Stover is not anticipated by the prior art presented in this record.

Appellants assign error to the fact that Cugley was joined as defendant. But Cugley's organization and management of appellant company and his relation to it justified this action. D'Arcy Spring Co. v. Marshall Ventilated Mattress Co., 6 Cir., 259 F. 236, 242; Proudfit Loose Leaf Co. v. Kalamazoo Loose Leaf Binder Co., 6 Cir., 230 F. 120, 140.

The finding of contributory infringement is amply justified. Appellant company's incubator is capable of being operated exactly according to the Stover process. It and its predecessors openly and repeatedly taught the Stover method in the catalogues issued to its customers, using exactly the same temperature suggested by Stover with substantially the same differentials of humidity. Only when notified of infringement did it change its catalogue and recommend that humidity as well as temperature be constant.

However, the decree must be modified. Appellant company sold the incubators with instructions that the Stover method be used, and hence is guilty of contributory infringement only.

Appellants may not themselves use the combination set forth in Claim 5, nor may they teach this use to others. Paragraph 5 of the decree is modified to read as follows:

"That a perpetual injunction issue out of and under the seal of this Court, directed to said defendants, George Cugley and Cugley Incubator Company, their privies, officers, agents, attorneys, clerks, servants, workmen, employees, representatives and associates, enjoining and restraining them and each of them from infringing said let-

ters patent No. 1,911,250, and particularly claim 5 thereof, from directly or indirectly making or causing to be made, using or causing to be used, advertising for sale, vending or causing to be sold in any manner, any articles, devices or parts thereof capable of being used to practice the patented method and directly or indirectly represented as being capable of such use."

So modified, the decree is affirmed.