## PETERSIME INCUBATOR CO. v. BUNDY INCUBATOR CO.

### No. 9345.

Circuit Court of Appeals, Sixth Circuit.

April 6, 1943.

Rowan A. Greer, of Dayton, Ohio (Toulmin & Toulmin, H. A. Toulmin, Jr., and Rowan A. Greer, all of Dayton, Ohio, on the brief), for appellant.

Albert L. Ely, of Cleveland, Ohio (Albert L. Ely, of Cleveland, Ohio, John M. Cole, of Springfield, Ohio, Ely & Fry, of Cleveland, Ohio, and Cole & Hodge, of Springfield, Ohio, on the brief), for appellee.

Before HICKS, ALLEN, and MARTIN, Circuit Judges.

ALLEN, Circuit Judge.

Appellant brought an action praying for a declaratory judgment holding Stover patent 1,911,249 for an apparatus for hatching eggs, and Stover patent 1,911,250, for a process for the incubation and hatching of eggs, both owned by appellee, invalid and not infringed, and an injunction against alleged acts of unfair competition practiced by the appellee. The answer denied the charge of unfair competition and asserted validity of the patents and infringement by the appellant. By stipulation of counsel the only claim in issue is method claim No.

5 of patent 1,911,250,[1] which appellant contends is invalid in law by reason of anticipation by prior patents, publications and uses, and because it lacks patentable invention over the prior art.

The District Court found that the prior art patents are substantially like those relied on in Cugley v. Bundy Incubator Co., 6 Cir., 93 F.2d 932, and that none of the prior art or alleged prior uses shows the patentable combination which constitutes the Stover invention. It concluded that claim 5 of the patent is valid, held it infringed by the appellant, and ordered injunction and an accounting.

The claim in issue has been fully considered and held valid by this court in Cugley v. Bundy Incubator Co., supra. Appellant, however, was not a party to that litigation and in this case it relies upon various prior art patents and alleged prior uses not presented in the former suit, and claims that these establish invalidity.

The general features of incubation have been commonly known for many years. The period for hatching hens' eggs is twenty-one days. At the beginning of the period the eggs are cold and must be brought up to and maintained at about body heat, 99 or 100 degrees Fahrenheit, for successful incubation. If the embryo becomes either overheated or overchilled, it is destroyed. During approximately the first ten days of incubation the eggs are endothermic, that is, they absorb heat. From the eleventh day on they are exothermic, that is, they generate and give off excessive heat. The Stover patent teaches the importance of maintaining the eggs at a constant temperature throughout the entire twenty-one day period, while increasing the humidity during the last three days, and describes a method of controlling both temperature and humidity at specified levels. The difficulty of the problems involved and the highly successful results in terms of decreased mortality of embryos and newly hatched chicks are fully described in the Cugley case, supra.

The Stover method provides for the use of two enclosed chambers equipped with means for controlling both temperature and humidity, the eggs being removed from the first, or incubating chamber, to what is referred to as the hatching chamber, at the end of the eighteenth day of incubation. The specifications of the patent describe the gist of the invention as follows: "The humidity control and the amount of humidity in the incubating compartment are the essentials of my invention. I arrange the humidity from 78 to 80 degrees while maintaining the temperature at 99½ degrees. When the eggs are at the end of the 18th day of incubation, I move them over into the hatching compartment where I increase the humidity from 84 to 86 degrees while maintaining the temperature at 99½ degrees."

In order to maintain the constant temperature and regulate the humidity at the desired level in the two chambers, Stover employs a humidifier cooler, containing a wheel which sprays water into a passage through which outside air is drawn into the hatching chamber. This operation permits an increase of humidity in the hatching chamber to the relatively high point desired and the process of evaporation involved offsets the heat given off by the exothermic eggs. As found in the Cugley case, supra, when the humidity is increased in the hatching chamber over that maintained in the incubating chamber, in accordance with the Stover process, without permitting the temperature of the hatching period to exceed the temperature of the incubating period, the chick breaks through the eggshell more easily, the possibility of infection is lessened, and and a sturdier chick is produced.

Under the early practice the temperature was increased in hatching. Cugley v. Bundy Incubator Co., supra, 93 F.2d at page 934. It is essential for the best results that the temperature be kept constant, and Stover gives definite and detailed instructions which, if followed, enable one skilled in the art to keep the temperature down and at the same time secure the proper increase in humidity at hatching. It is absolutely essential for the proper performance of the Stover process that these two conditions, increased humidity and constant temperature, be attained in the

[1] "In a method of operating a mammoth incubator, placing eggs in an enclosure, heating the air to a constant temperature, stirring the air in the enclosure, humidifying the air to a relatively low humidity, moving the eggs to another enclosure, again heating the air in which the eggs are located, again stirring the air, again humidifying the air to a relatively higher humidity without increasing the temperature and while maintaining it at the same constant."

hatching chamber. The need of maintaining the temperature in the hatching chamber at the same level as that in the incubating chamber was recognized before Stover, and certain efforts were made in the prior art to keep the temperature constant by the use of ventilation. But the experts for both appellant and appellee agree that when cool air is brought into the hatching chamber to hold down the temperature, the air which passes out of the chamber carries humidity with it, and decreases, instead of increases, the moisture. It follows that ventilation alone cannot solve the problem which Stover solves. The prior patents and prior uses relied on by appellants were unable to secure the results of Stover because the prior art revealed only water pans for controlling humidity and ventilation for cooling. As the District Court found, "The concurrent increase in humidity and the low temperature in the hatching chamber cannot be secured in incubators or hatching chambers in which water pans are the humidifying means and ventilation the cooling means. In such cases in order to offset the heat given off by the hatching eggs, the ventilators must be opened to such an extent as to cause the loss of the excess humidity." 43 F.Supp. 446, 452. In view of the testimony of both experts as to the effect of ventilation upon humidity, not only is this finding supported by the record, but no other finding could be made. It results, therefore, that the process of claim 5 could not be and was not practiced in the incubators of the prior art presented here.

■ The prior patents, as found by the District Court, plainly do not anticipate Stover. Scott, 1,624,629, and British patent to Guttinger, 162,294, taught the desirability of maintaining an even or uniform temperature. While, as shown by the testimony, this proposition was not uniformly accepted, certainly the idea of constant temperature was old. But these patents in no way described the process of increasing humidity at the same time that the temperature is maintained constant. De La Rue, 1,433,262, had only one chamber. Lackie, 1,820,311, and Markey, 1,751,093, state the general purpose of allowing conditions of temperature and humidity to be varied in accordance with requirements suited to the particular stage of incubation, but do not reveal what these requirements are. None of these patents discloses fans in the hatching compartments. Fries, 859,649, and High, 1,181,886, describe humidifying devices but do not teach their use in the incubating art. A review of the prior art patents presented herein adds nothing to the consideration of similar and closer patents made in the Cugley case. In fact it re-enforces our conclusion that the Stover process achieves such new and highly meritorious results that it rises to the dignity of invention, for the citation of these additional patents shows that the unsuccessful efforts to solve the problem were more widespread than was shown in the record in the Cugley case.

■ Nor do the prior uses invalidate the Stover patent. It was incumbent upon the appellant to prove these uses by clear and convincing evidence. The Barbed Wire Patent, 143 U.S. 275, 284, 12 S.Ct. 443, 36 L.Ed. 154; Collins v. Hupp Motor Car Corp., 6 Cir., 22 F.2d 27; United Shoe Machinery Corp. v. Day Wood Heel Co., 6 Cir., 46 F.2d 897. We agree with the District Court that upon the evidence produced the appellant failed to meet the requirements of the law as to each and every prior use submitted. In all sixteen prior uses were pleaded, but the voluminous evidence with reference thereto falls in general into the Petersime, McCoy, Adair and Porter groups. The District Court's advantage of seeing the witness is particularly emphasized in this case, where there was serious conflict of testimony with reference to a number of the alleged prior uses. On all points there is ample evidence to sustain the findings of the District Court upon this phase of the case.

The McCoy prior use was urged by appellant in Cugley v. Bundy Incubator Co., supra; but it was unnecessary there to examine into the period and extent of the alleged operation in any detail, because the District Court had held that there was no anticipation since no prior use of the McCoy apparatus or method was shown outside of Canada, and this finding was supported by the record.

At the present trial an effort was made by appellant to establish prior use of the McCoy machine in this country. Appellant does not contest evidence that the date of the Stover invention was around the first of May, 1929, but claims that the various prior uses were clearly established to have existed before that date. With reference to McCoy, the principal testimony was given by one Wellington J. Smith. Petersime, one of appellant's officers, admitted that

Smith "agreed to testify" as to the McCoy uses after more than $1,000 had been paid to him by Petersime for the McCoy patent, 1,740,741, and after an indebtedness of "several thousand dollars" against him had been cancelled. The McCoy patent apparently had proved to be a commercial failure some years before the sale. There was evidence that Smith had been interviewed on several occasions in connection with the trial of the Cugley case, and had not hinted as to the existence of prior McCoy use in this country; but in the present case he corroborated testimony by C. H. Dawson to the effect that the McCoy incubator had been built in Cleveland some time in January 1927, and had been publicly used there before the date of the Stover invention. Appellant's testimony as to the precise date of the Cleveland use was vague, McCoy placing it in "the latter part of 1927." Moreover, this alleged use was supported by no written evidence of any kind and was completely discredited by the contemporaneous records of the Lake Shore Show Case Company of Cleveland, which manufactured the first McCoy incubator. Two disinterested witnesses testified, and the ledger sheet showed, that this McCoy device was not completed until about July 20, 1927, and that it was at once shipped to Canada. While other machines were sold in Canada, appellant's witness Derr says that there was very little activity after the summer of 1927, and eventually the plant was locked up and dropped out of existence.

As to the alleged use by Bilz in Omaha in April 1929 of a McCoy incubator, no evidence is presented that Bilz ever practiced the Stover method on the McCoy machine.

With reference to the Petersime group, certain general circumstances reveal that the District Court was correct in finding that clear and convincing evidence was not given as to these alleged prior uses. The witnesses who described such uses were all relatives of or directly connected with the Petersime family, which controls the appellant company. The incubators relied upon were equipped with no instruments for determining humidity and no contemporaneous records were kept. Convincing evidence on the vital question of humidity demanded more than a comparison of condensation on incubator doors, for such condensation is an unreliable test of the amount of moisture present. It may in fact be as properly referable to atmospheric conditions outside as inside the incubator. A reading of this testimony demonstrates that the Petersimes and their employees neither practiced nor understood the Stover method.

The Adair group includes five different alleged uses at various places in California, concerning which one Charles E. Adair testified at length. His testimony is shot through with elements that are highly questionable. Typical of the testimony as to the Adair group was that with reference to the alleged Milligan prior use. Adair, Milligan and Downing all swore positively that Adair built an incubator for Milligan, with a separate hatching compartment, which was used at Lankershim, California, during the years 1924 and 1925. Adair produced a sketch of the machine which was stated in effect by all three to correctly describe the incubator. Adair admitted that he had drawn the sketch a day or two before testifying in 1938. The three witnesses described this machine as having a hatching compartment in the center, with two incubating compartments separated from the center compartment by solid partitions. They stated that the machine had a horizontal shaft passing through its center upon which were set fan blades which provided circulation in each of the three compartments. The sketch made by Adair roughly presented these features.

There was evidence that Milligan had only one machine in any way approaching this description in Lankershim, and in 1926 he showed it to Horace Isaacson, representative of the Buckeye Incubator Company, who obtained pictures of it, and in 1928 to Taggart, appellee's expert, who also had several pictures of the machine made. These pictures, which are in evidence, demonstrate that the Adair sketch and the testimony of Adair, Milligan and Downing are almost certainly at variance with the true facts. They reveal that the partitions between the compartments and the central passage in which the fans were situated did not reach either to the bottom or to the top, that no solid or full height partitions such as were described, and no central shaft, had ever been located in the cabinet. There were no holes through which the central shaft could operate, nor were there any nailholes to indicate that other partitions than those present in the pictures at any time existed in the incubator. In addition to the evidence of the pic-

584

tures, Hewitt, a hatcher who did much of Milligan's hatching business at this time, testified positively that the photographs made by Isaacson and Taggart were of the machine which Adair's sketch purported to describe. It is extremely unlikely that Adair's sketch and the photographs could both be correct. The record fairly indicates that the photographs are absolutely correct and that much of the testimony of Adair, Downing and Milligan, as well as Adair's sketch, was highly inaccurate if not deliberately fabricated.

Reservations as to Adair's credibility necessarily cast suspicion on all other alleged prior uses as to which his testimony was important, and the record presents concrete reasons for doubt in other instances. Adair testified that he built an incubator for the Universal Pictures Corporation in 1924, and presented in support of his oral statements a sketch, reports of test hatches and intructions for operating incubators alleged to have been made at the time. None of these papers were located prior to the decision in the Cugley case, supra, although Adair, who still owns an incubator company, was informed of that litigation and the "interest of the trade" would naturally have made him willing, if not eager, to testify if such evidence had existed at that time. None of these papers, though professing to relate to the business of the Univeral Pictures Corporation, came from the files of that company, which owned the incubators. They are further discredited by penciled notations and plainly evident discrepancies which tend to indicate that the documents were fabricated.

Apart from the possible fraud which existed with reference to the testimony on these prior uses, none of the devices involved could or did practice the Stover process, and the alleged prior use of Porter was equally incapable of securing the Stover results.

■ Clearly appellant's "Hatchibator" infringes on Stover. It embodies separate incubating and hatching compartments in each of which is located a rotary shaft with a plurality of disks which dip into a water pan and are controlled by an adjustable humidostat. This device is the mechanical equivalent of the humidifier cooler described by Stover. Petersime concedes that with it he can reproduce the exact conditions of the Stover process. The District Court found that the mechanical construction made this possible, and that

the incubator was sold with instructions intended and calculated to secure operation in accordance with Stover, and with the intent that it be so used.

■ The District Court must also be affirmed as to the feature of unfair competition. The circular which is the sole basis for the charge does not mention appellant's name and there is no testimony establishing unfair practices upon the part of the appellee.

■ Nor was it error to order injunction and accounting. The issues of validity and infringement having been pleaded and determined, the District Court had jurisdiction under the Declaratory Judgment Act, 28 U.S.C., § 400, 28 U.S.C.A. § 400, to grant further relief whenever necessary or proper. The application was made by petition, as specified in the statute, and the appellant had ample opportunity to show cause why the relief should not be granted.

The decree is affirmed.