## MERRELL–SOULE CO. v. NORTHLAND DAIRY CO.

Circuit Court of Appeals, Sixth Circuit. November 12, 1928.

No. 4994.

moisture from the solid particles. These then passed out through one exit and the mois-tened air through another. These are the steps claimed in the process patent; and his mechanism for practicing these method steps is the subject of the apparatus patent.

Claim 1 of the process patent is given in the margin.[1] Its patentable novelty and utility are attacked chiefly upon the basis of the Stauf patent, No. 666,711. This disclosed a process of reducing blood, milk, or similar liquids to a dry powder, and it consisted of spraying the liquid in its natural form through a current of hot air. Upon his application Merrell was referred to this patent; it had a claim which seemed broadly to cover the final step of Merrell's process; and it was purchased by appellants; and it was accepted and enforced by the courts as having that pioneer character. Merrell-Soule Co. v. Natural Co. (D. C.) 219 F. 572; Id. (C. C. A.) 222 F. 913. After much deliberation, the Patent Office held that the addition by Merrell of the pre-spraying condensation, making a two-step process, constituted a patentable improvement over Stauf, and thereupon this patent issued. Whether the Patent Office was right in this conclusion is the important question now presented as to validity.

The precise question involved was sharply raised in the Patent Office, and cannot now be better developed than by reciting the essentials of those proceedings.[2] Merrell describes his apparatus and method, and presents eight process claims, more or less analogous to claim 1 in suit. These are all rejected upon references to earlier patents, including Stauf, and the examiner points out that condensation in a vacuum was common. Merrell amends the claims, without much of any substantial alteration, and insists that the claims are allowable. There is another rejection, and the

Eugene A. Thompson, of Syracuse, N. Y. (Wm. M. Swan, of Detroit, Mich., on the brief), for appellant.

John F. Neary, of New York City (Ramsay Hoguet and Warren B. Hutchinson, both of New York City, and Dodds & Dodds, of Mt. Pleasant, Mich., on the brief), for appellee.

Before DENISON, MACK, and MOORMAN, Circuit Judges.

DENISON, Circuit Judge. Appellant, as owner, brought the usual infringement suit, based on patent 860,929, of July 23, 1907, for a process of separating moisture from the constituent solids of liquids, and on patent No. 1,000,931, dated August 15, 1911, upon an apparatus for such use. Both these patents were on application of Merrell and others. The court below held that the process patent was not infringed, and dismissed the bill as to both patents—doubtless implying the same reason as to the apparatus patent. The appellant has put these patents to extensive use for the purpose of making a milk powder. Neither process nor apparatus was ever used for this purpose before Merrell; and the patents became commercially a part of the basis of an important industry. There had been several efforts to get the solids of milk into dry and usable form, but none had been particularly successful. Merrell took the raw milk, and evaporated part of the water therefrom in a vacuum pan; the residue he then sprayed into a drying chamber, passing the spray through a forced current of dry air, which removed the remaining

---

[1] "The process of obtaining the solid constituents of liquids and semiliquids, in the form of powder, which process consists in concentrating the substance by removing a large percentage of the water therefrom, converting the concentrated mass into a fine spray, bringing such spray into a current of dry air or gas having an avidity for moisture so that substantially all the remaining liquid constituents are separated thereby, conveying the dry powder into a suitable collecting space away from the air or gas current, and discharging the air or gas separately from the dry powder."

[2] The file wrapper and contents are not made a part of the record on this appeal, nor printed therein; but both counsel have referred to the original exhibit sent up, and we have examined this, overlooking the informality.

examiner says: "The process is still considered fully anticipated by the references of record. * * * The other patents referred to different substances having different consistency. The references show that it is common to atomize fluids of different densities, hot or cold, and dry the spray in a current of heated dried air, and this is all that applicant does." Applicant responds with an argument pointing out how the pre-spraying condensation led to different and better results in the second, air-spray drying step of the process, and insists that, since it was not claimed that any one else had ever combined these steps, he is entitled to a patent. After pointing out this alleged new principle of operation and new result, he says: "Others have removed the moisture content of liquids by reducing them to complete dryness in vacuo, and still others have removed the moisture from liquids, introducing them in their original state into a desiccating chamber in the form of a spray wherein their entire moisture has been removed by subjecting the particles to a regulated current of heated air, but in neither case have said processes contemplated the result produced by applicants' process, for applicants have combined the good points of both processes, producing thereby a new result." The examiner is obdurate; he replies: "It is not seen that the claims present any patentability over the art disclosed."

Merrell presents a further argument, accompanying merely formal amendments of the claims. The examiner, after referring to the citations, answers: "For these reasons there is no invention in first partially drying the material in one way and then completing the drying in another way. According to the references, milk, blood, juices, dextrine, acid solutions, etc., may all be dried by this spraying process and these substances are all of different degrees of condensation. It is not admitted that the case contains any patentable novelty." Applicant replies, quoting the examiner's statement, that "there is no invention in first partially drying the material in one way and then completing the drying in another way," and continues: "If that were all that is contemplated by the invention, applicants here would respectfully bow to the decision of the examiner; but, etc., * * * applicants are not asking for a claim which contemplates the mere partially drying of a liquid substance in one way and then completing the drying in another way per se, but they have discovered that by the series of steps herein set forth they have produced a new product * * * and that this new product has only been produced by the discovery that the series of steps have not been contemplated before. * * * It is admitted that various substances have been dried by spraying processes, but it is not admitted that any one has heretofore discovered that there is a distinction between the effects produced by spraying the same substance at different densities, and it is submitted that there is nothing shown in the prior art which contemplates the production of a new product by first reducing the densities of the liquid, as low as possible without denaturalization, before spraying it, with the purpose of producing a cooling effect upon the solids." Applicant concludes by requesting a final rejection so that he could appeal. Evidently impressed as to the possible merit of the theory applicant was now urging, the examiner replies that this theory of invention was not supported by the application, but that the specification proposed to use the process with many "substances of such different natures that they would represent every possible degree of concentration. That applicant changes these to a definite degree of viscosity before he begins to spray them by an atomizer, as stated in his argument, reducing the densities of the liquid as low as possible without denaturalization before spraying, is certainly not a part of the invention as claimed."

Thereupon applicant adds to the specification a complete description of his invention from this point of view, and substitutes— again by changes which were more or less merely formal—the two claims now found in the patent. Immediately the application was allowed and the patent issued. The new matter so inserted became lines 41–102, p. 3, of the issued patent. The substance of this and of similar matter already in the papers was that it was vital to maintain the solids not chemically changed or degenerated by the process; that heat of the degree required for the spray dessication would injure the solids, if continued long enough to evaporate all the water contained in a spray of the original liquid; that in the spray containing only (e. g.) one-quarter as much water as in the original form, the extreme heat could be used so momentarily, and the quicker evaporation of the water from the smaller particles would so far keep them cool that the completely dry powder was produced with no danger of sterilization or pasteurizing; and that this was to be accomplished by such a degree of pre-condensation that there remained only the amount of water which could be thus instantly dried away without injury to the

solids. The amendment then points out, with sufficient accuracy (Minerals Separation v. Hyde, 242 U. S. 261, 271, 37 S. Ct. 82, 61 L. Ed. 286) how far the concentration process is to be carried. It states a particular degree of concentration which it considers would give the best results, but contemplates substantial variations in each direction. With this history, it is not to be doubted that the claims, as allowed, were intended to formulate the invention as the applicant and the examiner had thus understood its substance to be. Claim 1 contemplated the removal of *such* "large percentage" of the water and the use of a current of dry air having *such* an avidity for moisture that the small percentage of water remaining would be taken up by merely bringing the spray into the moisture-avid current. That the product of this two-step process is superior to, and in a sense different from, the product of the one-step Stauf process, is fairly well shown by elaborate tests upon a large quantity of milk, half of which was treated by each process. The two-step product was heavier for its bulk, and had distinctly better keeping qualities. The reasons for these results are pointed out by appellant's expert in a satisfactory way. Defendant's expert minimizes these findings by suggesting that similar differences in form and quality might be accomplished by variations in the one-step process; but this has not been done, and it remains a theory. Surely the two-step process involves less risk of injury by heat, and carries a greater certainty of good keeping qualities than the one-step process; and this is enough to support patentable utility. We think it therefore fairly clear, not only that Merrell was the first ever to practice this two-step process, but that he obtained thereby a better result than was ever before known.

It remains only to consider whether, the Stauf one-step patent process being known, the addition to it of the previous condensation was so obvious and natural an expedient that it would have been adopted by any one versed in the art. Neither from this record nor from general knowledge can we safely say this. The condensed milk which was a market commodity, and naturally would come to the mind of one thinking in that direction, may or may not have had the water removed to the degree contemplated by the specification. It may have been too thin to get the good result; it may have been too thick to suggest that it could be successfully sprayed in a practical way.[3] To switch the unfinished condensation process to another track, and travel another road to another product, may or may not have been obvious; we do not know. The reasons which finally convinced the examiner that the applicant had gone beyond the obvious, and convinced him against his contrary prepossession, we accept because we cannot challenge them, and the record does not overturn them. The very question was completely stated and well comprehended by Judge Geiger in Merrell-Soule Co. v. Rico (D. C.) 268 F. 366, and in the light of the Patent Office history above recited; Judge Geiger concurred with the examiner, and his careful discussion meets every argument now presented against validity. There is nothing of importance in the present record not considered by him. He thought the validity clear enough to justify a preliminary injunction, even upon an unadjudicated patent.

We have not put the customary stress upon the conduct of defendant in copying the patented process when it might (for six years before suit brought) have used the Stauf process without danger; and we have omitted this because the Merrell process is not only better but cheaper, and defendant insists that it was moved by the latter reason only. This may be true; but that an improved process is cheaper does not militate against its patentability.

We concede that, if the adoption of an improvement is really an obvious thing, it does not become patentable merely because the one who does first adopt it finds that it carries advantages and benefits which had not been apparent; but the latent and undiscovered presence of these compelling benefits in the long familiar condensation strongly tends to show that the improvement had not been so obvious as it may later seem. Merrell made his first steps in 1904. He carried them through an experimental device and one commercial device, and then several months into a second commercial device, covering a period of 18 months—all before the use of the pre-

[3] These suggestions are not fanciful. We are told that condensed milk in its best market form had about 70 per cent. of the original water removed but contained 40 per cent. of added cane sugar; while a common market grade of evaporated milk still retained about 85 per cent. of the original water. Ency. Americana, "Milk"; "Condensed Milk." Apparently the former compound would be a sticky, unsprayable mass; the latter had stopped far short of the minimum condensation prescribed by Merrell.

condensation occurred to him. The Stauf patent had been published five years, but no one had thought of this expedient; indeed, without the aid of this new step suggested by Merrell, it is doubtful whether the Stauf patent would ever have been heard of commercially. To say this is not to disparage the pioneer character of that patent; but very probably the additional cheapness of process and quality of product brought by Merrell, when united with the primary invention, led to the commercial results.

Before leaving the subject of validity, the Matthieson patent, No. 163,094, should be noticed. This was for a process of making sugar. The juice was evaporated in a vacuum pan and the sticky residue dropped through a screen, falling through a current of hot air, which took away enough moisture so that some crystals formed, and the remaining syrup adhered to the crystals. This use does not seem close enough to be anticipatory. The solids in cane juice under such treatment become crystals or agglomerations of crystals, and not at all the almost impalpable powder of the Merrell process; nor are the sugar solids of such complex and unstable character as those of milk. That a treatment which would make "coffee sugar" out of cane juice would also make a dry powder out of milk was not obvious; nor was it true, except by substantial change.

We think the process patent was infringed. Nothing is suggested to the contrary, save that in the complete apparatus shown in the process patent means are provided by which the blast of air entering the desiccating chamber is not only heated but is dried by a moisture extracting process. It is said that the language of the claim—"a current of dry air having an avidity for moisture," etc., contemplates such a special drying process. We are not so impressed. Certainly the current of heated air blown in by defendant is dry enough and has sufficient avidity for moisture to extract all the moisture which remains; and this is all that is required. If we thought that the addition of the precondensing step to the Stauf process was not a patentable improvement, it would be impossible to sustain the patent save by implying a limitation to this air-drying step; but this latter step loses its distinctive importance, if patentability is found elsewhere. When air is heated and expands, its cubic foot humidity is lessened—it is "dried." The specification only says that the air before entering, "is preferably passed through a drying chamber." The application in its earlier stage contained two process claims,

expressly limited to this extra drying chamber, and other process claims that were not. The claims finally proposed and allowed contained no such express limitation. The discussion between the examiner and applicant which led to the grant of the patent suggests no dependence upon any such specific idea, but rather the contrary. When the apparatus application was filed, this limitation was transferred to, and appears in, that application, and it survives in some of the claims of the apparatus patent. We cannot think that the mere phrase "dry heated air" must be confined to the output of some moisture-extracting apparatus.

Appellant's counsel urge that the word "dry" was inserted by amendment, and opposing counsel interpret this claim as an appeal to give it the restrictive effect of a compulsory amendment. We understand appellant's counsel rather to refer only to the exact fact shown by the record, which is that this word was inserted with a pen by Merrell's attorney in the typewritten proposed amendment before he approved it and sent it in for filing. In this situation the word can have no abnormal force.

Claim 3 of the apparatus patent is quoted in the margin.[4] Claim 4 is generally similar. As the result of the principles already discussed, we see no reason why these claims are not to be accepted as reciting patentably novel combinations. Suitable apparatus for practicing a novel method is ordinarily itself, patentable, even if it is a combination of old elements. They are infringed. It is additionally evident that the chamber for pre-drying the air is not intended to be an element of claims 3 and 4, because it is specified in two of the other claims not in suit.

The patents suggest a possible doubt whether the apparatus, claimed four years later, and as broadly as in these two claims, is not so inseparable from the method as to make the later patent constitute double patenting. This has not been argued, and invalidity for this reason is, to say the least, not clear enough to require us to initiate the objection. We therefore conclude that there

4 "An apparatus for recovering the constituent solids of liquids or semiliquids in the form of a dry powder, comprising means for removing part of the moisture from the liquid to thicken the liquid, a desiccating chamber, means for forcibly injecting the thickened liquid into the desiccating chamber in a finely divided state, and additional means for forcibly driving a desiccating agent into the desiccating chamber, and further means for collecting the dry solids separately from the moisture laden desiccating agent."

should be a decree for plaintiff under these two claims.

The process patent expired shortly after the suit was commenced; the apparatus patent has expired, pending this appeal. Hence there can be no decree excepting for an accounting. If the case had been planted upon the process patent alone, equity jurisdiction would have been doubtful, because it would have been impossible, in good faith, to expect to get a preliminary injunction within the one remaining week of the patent term; but full equity jurisdiction did exist as to the apparatus patent; and we think equity, under these circumstances, will take jurisdiction of the whole controversy.

The decree is reversed, and the case remanded for the entry of a new decree pursuant hereto. The present record suggests, though incompletely, that established royalties will form, or indicate, the measure of damages. If not, the master should fix a reasonable royalty for use, if the court should adopt that theory of measuring damages.